# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into as of April 13, 2020 (the **"Effective Date"**) by and among Harley-Davidson Motor Company, Inc. d/b/a Harley-Davidson Motor Company, having an address of 3700 West Juneau Avenue, Milwaukee, WI 53208 ("**Buyer**"), JHD Holdings Inc., a Wisconsin corporation having an address at P.O. Box 322, Naples, Florida 34106 (the "**Company**" and/or "**Seller**")**,** Sara Pomeroy, as the sole shareholder of the Company ("**Shareholder**"), and, for the purposes set forth in Section 3.1 of this Agreement, Eric Pomeroy. Capitalized terms used herein but not defined shall have the meanings set forth in Section 1.1 herein.

## ARTICLE I
## PURPOSE AND DEFINITIONS

**Purpose.** The Company owns and formerly operated a motorsports dealership located at 3223 North Pontiac Drive, Janesville, Wisconsin 53545 (the "**Dealership Premises**"), which was used by Seller to sell, service and provide (i) new and used products originally distributed by Buyer**,** (ii) other used motorsports products, and (iii) new motorsports parts and accessories; and Seller also owns, leases and/or licenses all tangible and intangible assets used in conjunction therewith, (collectively, the "**Business**"). Buyer wishes to purchase certain of the operating assets of the Company used in the Business, while the Company will retain the Excluded Assets and Retained Liabilities. The purchase of the Operating Assets and the other transactions provided for herein are subject to various conditions set forth herein, including approval of the Bankruptcy Court having jurisdiction over the Company's pending Chapter 11 case in accordance with Article VII of this Agreement (any and all such Bankruptcy Court approvals being collectively referred to herein as the "**Bankruptcy Court Approval**").

### 1.1 Certain Definitions.

(a) "**Annual Financial Statements**" has the meaning set forth in Section 4.4.

(b) "**Applicable Law**" means all applicable provisions of any constitution, statute, law, ordinance, code, rule, regulation, decision, order, decree, judgment, release, license, permit, stipulation or other official pronouncement enacted, promulgated or issued by any Governmental Authority.

(c) "**Assumed Liabilities**" has the meaning set forth in Section 2.8.

(d) "**Closing Accounts**" mean the amount of accounts receivable due to the Company at the time of Closing and defined in Section 2.6.

(e) "**Closing Schedules**" has the meaning set forth in Section 9.9.

(f) "**Customer Obligations and Deposits**" means the Inventory orders, customer deposits, and "We Owes" of the Company owed to customers of the Company.

(g) "**Encumbrances**" means all liens (statutory or otherwise), security interests, claims, pledges, licenses, equities, options, conditional sales contracts, assessments, levies, easements, covenants, conditions, reservations, encroachments, hypothecations, equities, restrictions, exceptions, limitations, charges, possibilities of reversion, rights of refusal or encumbrances of any nature whatsoever.

(h)    **"Excluded Assets"** means all accounts receivable, lease reserves, security deposits, cash and cash equivalents (including the Purchase Price), Fixed Assets, vehicles and trailers (excluding any Operating Assets), investment assets, prepaid expenses, cash value of life insurance, LIFO inventory reserve, pre-Closing tax benefits (excluding any real estate tax abatements), pre-Closing attributes and refunds of the Seller if any, corporate minute books, stock records and similar entity legal records and tax records (although Seller hereby agrees that such records will be made available for copying by Buyer following the Closing), and all causes of action belonging to Seller's bankrupt estate under Article V of the Bankruptcy Code and all proceeds derived therefrom that shall remain the property of Seller.

(i)    "**Financial Statements**" has the meaning set forth in Section 4.4.

(j)    "**Fixed Assets**" means furniture, fixtures, computers (including all software licenses relating to the computers), office equipment, office supplies, machinery, shop equipment, tools, leasehold improvements, signage (other than Harley-Davidson branded) and other personal property owned by Seller located at the Dealership Premises (excluding any Inventory).

(k)    **"GAAP"** means generally accepted accounting principles applied in accordance with the Company's past practice as reflected in the Annual Financial Statements.

(l)    **"Governmental Authority"** means any legislative, executive, judicial, quasi-judicial or other public authority, agency, department, bureau, division, unit, court, tribunal, or other public body, person or entity.

(m)    "**Intangible Assets**" means goodwill, covenants not-to-compete and all of Seller's intangible property rights associated with the Business including, but not limited to, business names, email addresses, URLs and domain names, social media sites, telephone/facsimile numbers, and any other intangible assets owned by the Seller related to the Business.

(n)    "**Internal Financial Statements**" has the meaning set forth in Section 4.4.

(o)    **"Inventory"** means, collectively, any and all inventory owned by the Company relating to the Business as of the Closing, including, without limitation, any Parts, Accessories and MotorClothes® and other garments; New Motorcycles; Used Motorcycles; rental motorcycles; and any other inventory items of the type reflected on the Annual Financial Statements of the Company.

(p)    **"Knowledge"** has the meaning set forth in Section 12.17.

(q)    **"Material Adverse Change"** means any change which has or could reasonably be expected to have a material adverse effect on the condition of the Business or the Company; but excludes (1) any change that is caused by conditions affecting the United States or Wisconsin economy generally or the retail powersports industry**,** and (2) any change that is caused by an announcement of the proposed Transaction or the proposed Transaction otherwise becoming known.

(r)    "**Maximum Assumed Liabilities Amount**" has the meaning set forth in Section 2.8.

(s)    "**New Motorcycle Inventory**" means all of Seller's inventory of new, undamaged, and not previously titled Harley-Davidson Motorcycles with less than 50 miles on the odometer and all of Seller's Riding Academy Motorcycles as specifically set forth on Schedule 1.1(s).

(t)    **"Operating Assets"** or **"Assets"** means, other than the Excluded Assets, all of the Company's assets used in connection with the Business, including, without limitation, the following:

    i.   Harley-Davidson branded displays, brochures, marketing materials and supplies, customer lists and all files, records and other documents and materials pertaining to Seller's Business used by Seller in connection with the Business (except those items, if any, required to be retained by law, in which case Seller will provide copies of the items to Buyer). Unless permitted above, neither Seller nor Shareholder (or any of their respective affiliates) shall retain any originals or copies of any customer lists, files, records and other documents and materials pertaining to the Business, and in no event shall use any such lists, files, records and other documents and materials in any manner in connection with any other business owned by Seller, Shareholder or their respective affiliates.

    iii.   All telephone numbers, website addresses, domain names and advertisements, and the name "Boardtracker Harley-Davidson" or any variations thereof, which names shall not be used by Seller (or its affiliates) after the closing, and any other assumed names connected to the Assets and the goodwill of Seller. At and after Closing, Seller and Shareholder will cooperate with Buyer to ensure that Buyer receives all of Seller's and Shareholder's right, title and interest in and to the name "Boardtracker Harley-Davidson" and becomes the registered owner of said trade name as recognized by the State of Wisconsin.

    iv.   To the extent transferable, Seller's product and service warranties of manufacturers with respect to products purchased, sold, distributed or serviced with respect to the Business on or before the Closing Date.

    v.   All of Seller's intangible property rights arising from or concerning the Business, including rights arising under insurance policies and, to the extent transferable, restrictive covenants and similar obligations.

    vi.   All of Seller's Parts, Accessories & MotorClothes.

    vii.   All of Seller's New Motorcycles.

    viii.   All of Seller's Used Motorcycles.

    ix.   All of Seller's Intangible Assets.

   Collectively, the assets identified in subsection (t) hereof may from time to time be referred to as the **"Assets"** or the **"Operating Assets."** Seller shall ensure that all of the Assets are, as of the Closing Date, free and clear of any Encumbrances. The parties agree to be bound by the allocation of assets set forth in Section 2.7 for all federal, state and local income tax purposes. The parties further agree to submit Internal Revenue Service Form 8594 (or other forms required by law) in accordance with the allocation of assets as set forth herein.

   (u)    **"Parts, Accessories & MotorClothes"** means all new and undamaged parts, accessories, logoed clothing items, MotorClothes, merchandise, gifts, collectibles and other retail inventories, contained in unopened and unmarked packaging, shown in current manufacturer price books or catalogues.

   (v)    **"Purchase Price"** has the meaning set forth in Section 2.2.

   (w)    **"Retained Liabilities"** has the meaning set forth in Section 2.4.

(x)	**"Transaction"** means the sale by the Company and the purchase by Buyer of the Operating Assets in accordance with the terms of this Agreement, and all other related transactions between the parties provided for herein.

(y)	"**Used Motorcycles**" means all used motorcycles (including, but not limited to any display motorcycles) owned by the Seller as specifically set forth on Schedule 1.1(y) and valued at current NADA rough book for purposes of determining the Purchase Price.

(z)	"**We Owes**" means any Parts, Accessories & MotorClothes, or any other part, accessory, service or product sold by Seller to a customer prior to the Closing that is not delivered or provided to the customer by the Closing, and any gift cards sold but not redeemed.

## ARTICLE II
## PURCHASE AND SALE OF OPERATING ASSETS

**2.1	Purchase of Operating Assets.** Subject to the terms and conditions of this Agreement, and in consideration of the mutual promises and conditions contained in this Agreement, the Company agrees to sell, transfer, convey, deliver and assign, and Buyer agrees to purchase, all of the Operating Assets from the Company in exchange for the Purchase Price, with title to such Operating Assets being free and clear of all Encumbrances of any kind.

**2.2	Consideration for Operating Assets.** The Purchase Price constitutes the total consideration for all Operating Assets acquired by the Buyer. The Buyer will not assume any of the debt or other obligations, including the Retained Liabilities, of the Company or the Shareholder, except that the Buyer will assume (and will only assume) the Assumed Liabilities. The amount of any debt previously assumed by the Buyer and the amount of any Customer Obligations and Deposits previously delivered to the Seller or its agents will constitute a credit against the Purchase Price otherwise due at the time of Closing.

**2.3	Purchase Price; Payment of Purchase Price.** The purchase price for the Assets is $974,257.00, subject to any adjustments as otherwise provided herein (the "**Purchase Price**"). At the Closing, Buyer shall pay to the Company, in immediately available federal funds to an account designated in writing by the Company, an amount equal to (a) the Purchase Price, minus (b) on a dollar-for-dollar basis, the amount of any debt, liabilities, obligations, including, without limitation, any Customer Obligations and Deposits, previously assumed or paid (pursuant to Section 2.5 or otherwise) by the Buyer, minus (c) on a dollar-for-dollar basis, the amount of any Assumed Liabilities in excess of the Maximum Assumed Liabilities Amount (collectively, the "**Closing Payment**").

**2.4	Seller's Liabilities.** Other than the Assumed Liabilities, all liabilities of the Seller, including, without limitation, any liabilities or obligations of Seller relating to the Excluded Assets or third-party contracts (including any and all service contracts), will be retained by the Company (the **"Retained Liabilities"**). To the extent that, notwithstanding this provision, the Buyer becomes liable after the Closing for any of such Retained Liabilities (such as service contract liabilities, etc.), and if the Company fails to pay, perform or obtain a release of such liability or obligation within 30 days following receipt of written notice thereof, the Buyer may pay or perform such liabilities and either recover the amount thereof directly from the Seller, or deduct such amounts from any amount otherwise due to the Seller from the Buyer or its affiliates.

**2.5	Purchase Price Adjustments.** Seller acknowledges that it is solely responsible to pay its vendors and creditors. If Seller does not pay such remaining balances at or before the Closing and

such vendors or creditors refuse to conduct business with Buyer as a result, Seller agrees that Buyer can direct closing proceeds to such vendors and creditors in the required amounts at Buyer's discretion. Any such amounts will be set forth on the Closing Payment Schedule, which will be signed by Buyer and Seller. Seller shall be solely responsible to pay for any deficiencies in the payments.

       **2.6**    **Accounts Receivable.** The Company will continue to own all Closing Accounts after Closing. Following the Closing, Seller may thereafter, at its expense, seek to collect such unpaid Closing Accounts on its own behalf, and Buyer shall reasonably cooperate with such efforts, at Seller's sole cost and expense. Buyer will promptly notify and remit to the Company any amounts collected by Buyer with respect to the Closing Accounts as provided in <u>Section 6.4(a)</u>.

       **2.7**    **Allocation of Purchase Price.** The Purchase Price for the Assets, together with any liabilities and other amounts that are required to be taken into account in determining the purchase price of the Assets for all financial accounting and U.S. Federal income tax purposes, shall be allocated to the Assets as follows (the "**Purchase Price Allocation**"): (a) $468,827 shall be allocated to the purchase of New Motorcycles, (b) $94,314 shall be allocated to Used Motorcycles, (c) $161,116 shall be allocated to Parts, Accessories & MotorClothes, (d) $225,000 shall be allocated to the Intangible Assets, and (e) $25,000 shall be allocated to the noncompetition provisions contained in <u>Section 3.1</u>. Each Party shall file all Tax Returns (including amended returns and claims for refund) in a manner reflecting the Purchase Price Allocation. The Parties shall each execute and timely file a Form 8594 consistent with the Purchase Price Allocation, after exchanging mutually acceptable drafts of such form (and any equivalent state, municipal, county, local, foreign or other forms Tax forms). Notwithstanding the foregoing, Buyer's cost for the Purchased Assets may differ to the extent necessary to reflect Buyer's capitalized acquisition costs for the Purchased Assets.

       **2.8**    **Assumed Liabilities.** Buyer shall assume Seller's liabilities arising from outstanding Customer Obligations and Deposits as of the Closing to the extent such liabilities arose from arm's length transactions in the ordinary course of Seller's Business consistent with past practice (the "**Assumed Liabilities**"), but only to the extent that such Assumed Liabilities do not exceed $30,000 in the aggregate (the "**Maximum Assumed Liability Amount**"). Seller represents, covenants and agrees that the Assumed Liabilities do not exceed the Maximum Assumed Liability Amount. The amount by which the aggregate amount of the Assumed Liabilities exceeds the Maximum Assumed Liability Amount shall constitute a Retained Liability.

**ARTICLE III**
**PERSONAL AGREEMENTS**

       **3.1**    **Non-competition Agreement.** The Company, Shareholder and Eric Pomeroy will enter into a Non-competition Agreement in the form attached as **Exhibit A** (each a "**Non-competition Agreement**"), agreeing not to compete, directly or indirectly, with the Business as historically conducted within a 50 mile radius of the Dealership Premises for a period of three (3) years from and after the Closing Date.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER AND SHAREHOLDER

The Seller and Shareholder, jointly and severally, represents, covenants and warrants to Buyer as follows as of the date hereof and as of the Closing Date:

**4.1     Organization and Good Standing.** The Company is a corporation and duly incorporated, validly existing, and in good standing under the laws of the State of Wisconsin. The Company is not required by the nature of its assets or business to qualify as a foreign entity in any other jurisdiction. The Company has full power and authority to own all of its assets and to carry on the Business as it has been previously conducted. The Company has no subsidiaries and no direct or indirect ownership interest in any corporation, partnership, joint venture, limited liability company, limited liability partnership, association, or other entity. The Seller holds good and marketable title to all of the Assets being sold free and clear of any pledge, right to purchase, or other limitation, subject to Bankruptcy Court Approval under Section 363(b) and (f) of the Bankruptcy Code.

**4.2     Corporate Authority.** Subject to Bankruptcy Court Approval, each of the Company and Shareholder has the authority to execute, deliver and perform this Agreement and to comply with all the provisions herein. Subject to Bankruptcy Court Approval, each of the Seller and Shareholder has the authority to enter into this Agreement and to consummate the Transaction, specifically including transferring good and marketable title to the Assets to the Buyer. Seller has obtained all required approvals and consents from all shareholders and owners of Seller, including Shareholder, and the individual signing on behalf of Seller below is authorized and directed to do so in accordance with Seller's organizational documents. This Agreement is legally binding and is enforceable in accordance with its terms as to each of the Company and Shareholder, except as enforceability may be governed or limited by applicable bankruptcy, insolvency, debt moratorium and other laws and equitable principles affecting creditors' rights generally and the discretion of the courts in granting equitable remedies. No approval or consent of any other person is required in connection with the execution, delivery, and performance by the Seller or Shareholder of this Agreement, other than, with respect to the Company, any shareholders and owners mentioned above.

**4.3     No Violation of Obligations and No Defaults.** The execution and delivery of this Agreement, and the consummation of the Transaction, will not violate any agreement or commitment made by the Company or Shareholder or any requirement binding on the Company or Shareholder, as applicable. The execution and delivery of this Agreement and the consummation of the transactions contemplated in this Agreement will not conflict with, violate or constitute a default under any contract or other instrument to which Seller or Shareholder is a party or by which Seller or Shareholder is bound.

**4.4     Financial Statements and Information.** The Company's annual financial statements as of December 31, 2018 and December 31, 2019 (the **"Annual Financial Statements")** are attached to Schedule 4.4 and incorporated by reference herein and any additional un-audited financial statements hereafter provided to Buyer (collectively referred to hereinafter as the **"Financial Statements").** In addition, Seller shall have an ongoing obligation to furnish to Buyer upon request certain other financial information, including interim or year-end financial statements through the Closing Date, relating to the Business (including, without limitation, sales, revenue and expense information contained in Seller's income statement and balance sheet) (all of which shall be considered "financial information"). In all material respects, the financial information: (i) is accurate and complete; (ii) is in accordance with the books and records of Seller pertaining to the Business, which in turn are accurate and complete; and (iii) has been prepared in accordance with GAAP

consistently applied and fairly presents the Business's financial position, including but not limited to the results of operations, as of the dates indicated. Any items of income or expense that are unusual or of a nonrecurring nature during any such period or at any balance sheet date are and will be separately disclosed in the financial information. Seller has not withheld or failed to provide to Buyer any information that would be material to Buyer's evaluation of the financial condition and contingent liabilities, if any, of the Business. Further, Seller has furnished or will furnish to Buyer any employee handbook, copies of employee files, specification of vacation pay and benefit accruals and Seller's pay policies. Seller shall make its office manager available to Buyer during reasonable business hours to discuss financial matters and business questions with Buyer's representatives.

**4.5** **Tangible Assets.** Subject to Bankruptcy Court Approval, there will be no Encumbrances of any kind or nature relating to, secured by or outstanding against the Assets, including but not limited to any liens placed upon any Assets by any federal, state or local authority relating to unpaid taxes. The Company has good and marketable title to all of the Assets. All Assets that should be reflected on the Financial Statements are shown on the respective balance sheets included in the Financial Statements and Internal Financial Statements. In addition to the Assets shown on the Financial Statements, the Company has ownership of all Assets that are expendable items (such as tools and supplies) which would not normally be reflected on a GAAP balance sheet.

**4.6** **Inventory.**

(a) **Inventory.** All Inventory of the Company is correctly reflected on the books and records of the Company, including the Financial Statements, in accordance with GAAP. All Inventory that has been sold in the ordinary course of business subsequent to the date of the most recent Financial Statement is fully accounted for in the sales records of the Company. The Company has no used inventory of parts or accessories.

(b) **Inventory Incentives.** Notwithstanding anything to the contrary herein, Buyer shall be entitled to receive and retain all Vehicle Incentive Performance payments and all other incentives which relate to the New Motorcycles that are part of the Operating Assets.

**4.7** **Intangible Assets.** Except for the trademarks owned by Buyer and its affiliates, the Company has good and marketable title to all Intangible Assets necessary for the conduct of the Business as historically conducted**.** Intangible Assets include trade names, trademarks, service marks, copyrights, intangible information, intellectual property, know how, techniques, procedures, standard forms, manuals, books, records, contracts, leases, licenses, software, other agreements, as well as the good will and intangible know how used by or useable by the Company. Upon consummation of the Transaction, good and marketable title to the Intangible Assets included in the Operating Assets, free and clear of any Encumbrance of any nature whatsoever, shall vest in the Buyer and shall be fully available and useable by the Buyer in the conduct of the Buyer's business from and after the Closing Date except as otherwise provided in this Agreement. The Company's prior use and the Buyer's continued use in a manner consistent with past use, of such Intangible Assets has not and will not give rise to any liability of, or claim against, the Buyer, except as otherwise provided in this Agreement. To the Seller's knowledge, no third party, nor the Seller claims any proprietary right to any of the Assets, except as otherwise provided in this Agreement. Seller is not obligated or liable to make any payments by way of royalties, fees or the like to any owner or licensee of, or other claimant under, any intangible property with regard to its use or in connection with the conduct of Seller's Business or otherwise.

**4.8    Title.** The Company has and will have at the Closing good and marketable title to all of the Assets. Except for Bankruptcy Court Approval and as otherwise provided in this Agreement, neither the Seller nor the Shareholder require any third-party consent or approval for, or will be subject to any expense or penalty as a result of, the Transaction.

**4.9    Accounts Receivable.** The parties acknowledge that Buyer is not responsible for any disputes or issues that may arise with any of the account obligors related to accounts receivable, and the collection thereof.

**4.10    Absence of Undisclosed Liabilities.** Except for liabilities incurred in the ordinary and usual course of business consistent with past practice, or liabilities disclosed in Seller's Internal Financial Statements, the Company has no liabilities, and will, at the time of Closing have no liabilities, liquidated, actual or contingent relating to the Business and the Assets, including obligations to customers.

**4.11    Operations Since the Financial Statements.** Prior to filing for Bankruptcy, Seller operated the Business in the ordinary course of business.  Prior to and since filing for Bankruptcy, Seller has maintained Seller's records and books of account relating to the Business in a manner that fairly and accurately reflects Seller's transactions, assets, and liabilities. For purposes of this Agreement, "ordinary course of business" and similar terms or phrases means in accordance with the usages of trade prevailing in the industry in which the Business operates and in accordance with the Business' historical and customary day-to-day practices with respect to the activity in question. Without limiting the generality of the foregoing, since December 31, 2018 the Company has not entered, and will not enter, into any transactions except as set forth on Schedule 4.11 attached hereto and incorporated by reference herein, on other than standard and customary terms and conditions (but this shall not apply to payment or forgiveness of monies owed to affiliated parties). The Company will use reasonable efforts to maintain the integrity and adequacy of its current assets. Since December 31, 2018, there has not been:

(a)    **Cancellations.** Any cancellations of any debt or claim or any sale, transfer or conveyance of any of its Assets or properties (including but not limited to any sales, transfers or conveyances to affiliates of Seller) except by sales out of inventory in .the ordinary course of business;

(b)    **Damage.** Any damage, destruction or loss (whether or not covered by insurance) affecting its properties, business or prospects, or any material loss of or damage to physical property or other Assets, whether or not covered by insurance;

(c)    **Waiver.** Waiver of any rights of substantial value; or

(d)    **Lapse.** Disposal of or a lapse of any license, permit, trademark or trade name.

**4.12    Legal Proceedings.** Except for the Bankruptcy Court Approval, there are no private or governmental proceedings pending or, to the knowledge of Seller, threatened against the Operating Assets or Seller, including, without limitation, any claim, controversy, investigation, audit, lawsuit, threatened lawsuit, arbitration, workers' compensation claim, civil rights claim, or other legal or other proceeding of any nature whatsoever. Except for the Bankruptcy Court Approval, there is no outstanding judgment, order, writ, injunction or decree of any court, administrative agency, governmental body or arbitration tribunal against Seller or the Assets of Seller. The Seller covenants, represents and warrants that if there are any such actions, or such actions arise as a result of Seller's operations prior to, or following the Closing, the Seller will indemnify the Buyer and any Buyer

Indemnitee from and against any expenses, including legal fees, incurred by them with respect to any litigation against the Buyer from and after Closing.

**4.13    Material Agreements.** Other than the Dealer Contract with Buyer, Seller is not party to any contracts, documents, licenses, leases or other agreements which are material to the Business. At closing Seller will provide to Buyer documentation satisfactory to Buyer surrendering its Dealer Contract and all rights and obligations arising from or related to the Dealer Contract, and its motor vehicle dealer license with the State of Wisconsin for the Business.

**4.14    Licenses.** The Company has all governmental licenses, permits and other authorizations (collectively, the **"Licenses"**) necessary in connection with its ownership, possession, use, occupancy, or operation of its Business.

**4.15    Employees.** The Company has no current employees. None of the former employees of the Company were subject to any collective bargaining agreement or other union agreement. The Company has no oral or written employment agreements, consultant contracts (other than its broker agreement with Performance Brokerage Services), compensation bonus, deferred compensation, profit sharing, welfare or health benefit, or retirement plan or arrangement, whether or not legally binding, nor is the Company currently paying (or has any future obligation to pay) any pension, deferred compensation, or retirement allowance to anyone. All of the Company's former employees were at will, and the Company has terminated all employees without penalty. The Company is not, and has not been, in material violation of any regulation or requirement of the Employment Retirement Income Security Act of 1974 or any successor law, or any comparable law of the State of Wisconsin, or any regulations or rules issued by the United States government or the State of Wisconsin, respectively, in connection therewith. To its knowledge, Seller is, and during all applicable limitation periods has been, in compliance in all material respects with all applicable federal, state and local laws, executive orders and regulations respecting employment and employment practices, terms and conditions of employment, occupational safety, wages and hours The Company is current in all its obligations to former employees with respect to all the Company's compensation obligations and benefit plans. Seller is not a party to any written or oral contract, agreement or arrangement with any of Seller's present or former members, managers, officers, employees or consultants with respect to length, duration or conditions of employment (or the termination of employment), salaries, bonuses, percentage compensation, deferred compensation, health insurance or any other form of remuneration, or any other subject matter whatsoever. Seller represents to Buyer that the Worker Adjustment and Retraining Notification Act, 29 U.S.C §2101 et sq. ("WARN"), or any other similar state, local or foreign statute or government regulation or ordinance, is either inapplicable to the Transactions contemplated in this Agreement or Seller will fully comply with all of those statutes by the Closing Date. Seller does not currently have any obligations to any former employees under the COBRA laws and regulations.

**4.16    Compliance with Law and Lack of Knowledge of Adverse Information.** The Company is in compliance in all material respects with, and is not in material violation of, any Applicable Law relating to its Assets, properties or its Business and is not and has not been charged under, in receipt of any notice or warning of, or to Seller's knowledge, under investigation with respect to, any Applicable Law. To the knowledge of the Seller, there is no development, occurrence, or condition that would cause a Material Adverse Change to any of the Company's Assets, operations, or Financial Statements.

**4.17    Environmental Compliance,**

(a)    There is no consent decree, consent order, or other similar agreement to which Seller is a party in relation to any Environmental Law or Environmental Contamination (defined below). There have been no orders, notices or communications issued to Seller requiring an action or other response by Seller pursuant to any Environmental Law that have not been fully complied with and cleared. To Seller's knowledge, there have been no investigations conducted or other proceedings taken or threatened by any Governmental Authority or any other person under or pursuant to any Environmental Law with respect to the Business, the Assets or the Dealership Premises.

(b)    Seller has obtained all permits, licenses and approvals, has kept all records and has made all filings and disclosures required by Environmental Laws.

(c)    To Seller's knowledge, all personal property that is included within the Assets (collectively, the "**Properties**"), is free of Environmental Contamination, and no underground storage tanks, receptacles or other similar containers or depositories are, or to Seller's knowledge, ever have been, present on any of the Properties. None of the Properties is listed on or, to Seller's knowledge, being considered for listing on any list of contaminated sites maintained under any Environmental Law or is subject to or, to Seller's knowledge, being considered for enforcement action under any Environmental Law. To Seller's knowledge, none of the buildings or improvements that Seller owns, operates, leases or uses (or previously owned, operated, leased or used) in connection with the Business are (or were) constructed in whole or in part of any material that, in its present form, releases any substance, whether gaseous (including radon gas), liquid or solid, that gives rise to liability under any Environmental Law, including, without limitation, asbestos.

(d)    To Seller's knowledge, Seller has not been identified as a potentially responsible party with respect to any site at which Seller's Hazardous Materials (defined below) have been treated, stored or disposed. To Seller's knowledge, no Hazardous Materials have been or are used, stored, treated or otherwise disposed of by Seller in violation of Environmental Law. To Seller's knowledge, all Hazardous Materials removed from any of the Properties as a result of Seller's operations on the Properties were and are documented, transported and disposed of, in compliance with Environmental Law. To Seller's knowledge, no Hazardous Materials generated on or emitted from any of the Properties by Seller have caused or will cause, in whole or in part, any Environmental Contamination. To Seller's knowledge, Seller has not disposed of, permitted the disposal of, or knows of the disposal of any waste or Hazardous Material on any of the Properties.

(e)    For purposes of this Section: (i) "**Environmental Law**" means any federal, state or local statute, ordinance, rule, regulation or standard relating to air quality, water quality, solid waste management, Hazardous Materials, toxic substances or the protection of public health or protection or remediation of the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act; (ii) "**Hazardous Material**" means any contaminant, pollutant or other substance defined, designated or classified as hazardous, toxic, radioactive or dangerous under any Environmental Law, or that is otherwise regulated by any Environmental Law; and (iii) "**Environmental Contamination**" means the presence of any Hazardous Material in, on, or under the soil, groundwater or surface water, so as to result in any liabilities, fines, penalties or remedial obligations under any Environmental Law.

**4.18    Taxes.** The Company has correctly prepared and filed all tax returns, or appropriate extensions thereof, including foreign, federal, state, county and local income, excise, sales, employment, tariffs, import/export charges, property, withholding social security, franchise, license

information and other returns and reports. Each such return is true, correct and complete to the best of Seller's knowledge, information and belief.

**4.19    Insurance.** The Company maintains, in the Seller's reasonable business judgment, adequate insurance with qualified insurance carriers with respect to liability, and property loss and damage. Buyer must arrange for its own insurance coverages effective not later than the Closing Date.

**4.20    Books and Records.** The books of account and other financial records of the Company that have been made available to Buyer are complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices.

**4.21    Trademarks**.  The parties acknowledge that the intellectual property of Buyer, including websites, domain names, trade names, trademarks, service marks, design marks and copyrights relating to Buyer and its affiliates, are owned by Buyer or its affiliates and not the Company and are not a part of the Operating Assets of the Company, including but not limited to the assumed name "Boardtracker Harley-Davidson", which Company has registered with the State of Wisconsin.  Seller agrees to take all actions reasonably requested by Buyer to terminate and/or transfer such registrations to Buyer.

**4.22    Obligations to Brokers.** The Seller has not taken any action to incur any obligation for the payment of any brokerage commission, finder's fee, or any other similar obligation relating to this Agreement or the consummation of the Transaction other than to Performance Brokerage Services. Seller shall hold Buyer harmless and indemnify Buyer for any claims, losses or expenses: incurred by Buyer in connection with the claim of any broker, agent or other third party in connection with the transactions contemplated by this Agreement.

**4.23    Customers and Suppliers.** There are no existing or known claims against Seller with respect to the Business to return inventory or merchandise, by reason of alleged defects, or otherwise, for all purchases and suppliers considered collectively.

**4.24    Product Liabilities and Warranties.** Seller has made no express or implied warranties applicable to products sold or leased by Seller in connection with the Business except for manufacturer warranties expressly given by any manufacturer of the parts or accessories sold by Seller. There is no action, suit, proceeding or claim pending or to Seller's knowledge threatened against Seller under any warranty covering any products sold or leased by the Business, express or implied. There have been no product liability claims covering any products sold or leased by the Business asserted against Seller.

**4.25    Third-Party Warranty and Insurance Products; VIP Program; Gift Cards.** Seller has remitted to the appropriate third-party warranty and other insurance product providers all contracts signed and amounts paid by any customers to whom Seller sold such warranty or other insurance products in connection with the Business. Seller has no outstanding liabilities or obligations to any such customers with respect to any such third-party warranty or other insurance products. Except with respect to gift cards and gift certificates, Seller does not offer nor has offered in the past any type of fulfillment, award or credit program to customers where the Seller has received cash from a customer in exchange for a future service or product to be provided by Seller.

**4.26    Reliance.** The foregoing representations and warranties are made by the Company and Shareholder with the knowledge and expectation that Buyer is placing complete reliance on them. Neither this Agreement, the Exhibits, nor any other information provided by the Company or

Shareholder to Buyer in connection with this Agreement or any related agreement contains or will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements so made not misleading.

**4.27    Shareholder of Seller.** Shareholder is the only shareholder of Seller. There are no other shareholders of Seller.

**4.28    No Material Misrepresentation or Omission.** No representation or warranty by the Company or Shareholder contained in this Agreement, and no statement contained in any instrument, list, certificate, or writing hereafter furnished by the Company or Shareholder to Buyer pursuant to the provisions hereof or in connection with the Transaction, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrant to the Seller as follows:

5.1    **Authority.** Buyer has the authority to execute this Agreement and to consummate the Transaction. The individual signing on behalf of Buyer below is authorized and directed to do so in accordance with Buyer's organizational documents. This Agreement is legally binding and is enforceable in accordance with its terms as to Buyer, except as enforceability may be limited by applicable bankruptcy, insolvency, debt moratorium and other laws and equitable principles affecting creditors' rights generally and the discretion of the courts in granting equitable remedies. No approval or consent of any other person is required in connection with the execution, delivery, and performance of Buyer of this Agreement.

5.2    **No Brokers.** Buyer has not taken any action to incur any obligation for the payment of any brokerage commission, finder's fee, or any similar obligation relating to this Agreement or the consummation of the Transaction.

5.3    **No Material Misrepresentation or Omission.** No representation or warranty by Buyer contained in this Agreement, and no statement contained in any instrument, list, certificate, or writing hereafter furnished by Buyer to Seller pursuant to the provisions hereof or in connection with the Transaction, contains any untrue statement of a material factor omits to state a material fact necessary in order to make the statements contained herein or therein not misleading.

## ARTICLE VI
## COVENANTS OF PARTIES

**6.1    Pre-Closing Cooperation.** The parties agree that so long as this Agreement is in effect, and prior to the Closing Date, they will cooperate closely in connection with the following matters:

(a)    **Third Party Consents.** Each party shall cooperate in good faith and shall use their respective reasonable efforts to obtain any third party consents required to consummate the Transaction.

(b)    **Records Disclosure; Inspection.** From the Effective Date, through and including the Closing Date, the Company and the Seller will afford to Buyer and its representatives

access to the Company records and information including, without limitation, licensing and registration information, financial information, information with respect to customers, and any other reasonable information relevant to the assets, liabilities, and present and future operations of the Company, at times reasonably acceptable to the Seller and on reasonable prior notice. The Company and the Seller shall also afford Buyer or its agents access to the Dealership Premises for any proper and reasonable purpose they deem necessary. Buyer's right to inspect or to receive data and information shall terminate upon any termination of this Agreement.

(c) **Risk of Loss.** All risk of loss or damage to the Assets of the Company shall remain with the Company until Closing. If, before the Closing, the Assets are destroyed or damaged to the extent that the reasonably estimated cost of repair or reconstruction exceeds One Hundred Thousand Dollars ($100,000.00), then Buyer shall have the right to terminate this Agreement by written notice given to the Seller at any time within thirty (30) days following the date of such destruction or damage, and upon the giving of such notice this Agreement shall be of no further force or effect. If Buyer does not exercise such right of termination, then Buyer shall be obligated to proceed with Closing for the full Purchase Price, but the insurance proceeds received by the Company in connection with such casualty shall be deducted from the Purchase Price. In that event, the Company shall be entitled to all insurance proceeds payable as a result of such damages.

**6.2     Preservation of Operating Assets.** After the Effective Date of this Agreement, the Seller and the Company agree to take commercially reasonable actions necessary and appropriate to maintain the Operating Assets and goodwill of the Company, and Seller agrees to take such actions, including, without limitation, the following:

(a) **Third Party Agreements.** The Company will not terminate or materially alter their agreements with third parties.

(b) **Transfer of Assets.** The Company will refrain from transferring any of its Assets (including but not limited to sales, transfers or conveyances to affiliates of Seller).

(c) **Contracts and Leases.** The Company will refrain from entering into any lease, contract or other commitment, except with the prior written consent of Buyer.

(d) **Inventories.** The Company will keep its parts and shop materials inventories at the same levels they are at the date of this Agreement and will not place any new inventory orders with Buyer.

**6.3     Expenses.** Buyer and the Seller will each bear all of their own expenses, including legal and accounting expenses, incurred by them in connection with the Transaction. To the extent the Company pays or becomes obligated for any expenses relating to this Transaction, such expense or obligation shall not reduce the value of the Assets.

**6.4     Post-Closing Covenants.**

(a) **Collection of Receivables.** The Buyer agrees that it will, in the ordinary course of its business, notify, collect and remit to the Seller the proceeds of any Closing Accounts, and Seller agrees to provide appropriate information and other cooperation to the Buyer in connection therewith. Collections on Closing Accounts will, unless specially designated otherwise by the account debtor, be treated as a first-in-first-out basis, treating as the property of the Seller all obligations accrued as of the time of the Closing prior to treating any additional payments as the proceeds of any account receivable or other right accruing to the Buyer from and after Closing. Seller will assume all

responsibility for collection of any unpaid Closing Accounts from and after the Closing Date. Notwithstanding anything herein to the contrary, Buyer shall have no obligation to exert any affirmative collection efforts on Seller's behalf after the Closing with respect to Seller's accounts receivable. However, if Buyer receives payment for any of Seller's accounts receivable, strictly as an accommodation to Seller and without any consideration, Buyer shall forward payment directly to Seller; *provided, however,* that (i) Buyer will not be deemed to be acting as agent for Seller with respect to such receipt and delivery; (ii) Seller hereby releases Buyer from any and all claims of any kind resulting from Buyer's activities with respect to such receipt and delivery; and (iii) Seller agrees to indemnify and hold Buyer harmless from any and all claims relating to such receipt and delivery. Buyer shall promptly notify and turn over to Seller upon receipt of any of Seller's accounts receivables or any other Excluded Assets. Except for any Assumed Liabilities not exceeding the Maximum Assumed Liabilities Amount, Buyer shall not assume or be obligated to pay, perform or discharge any liability, obligation, debt or expense of Seller of any kind or nature, even if imposed upon Buyer as a successor to Seller.

(b) **Adjustments and Offsets.** In the event that any claim is made by any third party against the Buyer with respect to any debt or other obligation incurred by any of the Seller or the Shareholder, before or after Closing, including, without limitation, any Assumed Liability exceeding the Maximum Assumed Liabilities Amount, the Buyer shall promptly advise the Seller of the existence of such claim and the Seller will resolve such matter. If the Seller does not promptly resolve such matter and the Buyer reasonably determines that it will suffer any business detriment as a result of such claim, the Buyer may proceed to pay such claim and Seller and Shareholder shall jointly and severally indemnify and hold harmless Buyer for such amounts paid and any other losses incurred by Buyer or its affiliates arising from or relating thereto. Buyer shall have the right to offset against amounts due to Seller or Seller's affiliates under this Agreement or the amount of any credits relating to Assets directly issued to Seller by the Buyer after the Closing that are not turned over to Buyer.

(c) **Other Cooperation.** The parties will cooperate in all other reasonable respects after Closing including, without limitation, providing to one another access to, and copies of, records which may be of common interest for tax and other purposes.

(d) **Survival of Representations.** At the Closing Date, all of the representations and warranties contained in this Agreement will be true and correct and have the same force and effect as though made at and as of the Closing Date. Except for any willful or knowing breach or misrepresentation, as to which claims may be brought without limitation, the representations and warranties shall survive the Closing for a period of three (3) years.

## ARTICLE VII
## BANKRUPTCY COURT APPROVAL

**7.1    Bankruptcy Court Approval.**

(a)    Buyer hereby acknowledges that Seller is currently in proceedings under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Wisconsin under case no. 19-26915-beh (the "**Bankruptcy Case**"). This Agreement is subject to final approval by the Bankruptcy Court. Within three (3) calendar days following the parties' execution and delivery of this Agreement, Seller shall file with the Bankruptcy Court a motion or motions (in form and substance reasonably satisfactory to Buyer) seeking entry of an order of the Bankruptcy Court approving the sale of the Assets (the **"Sale Approval Order"**). The Sale Approval

Order shall, among other things, approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (i) the execution, delivery and performance by Seller of this Agreement; (ii) the sale of the Assets to Buyer on the terms set forth herein free and clear of all Encumbrances; (iii) the performance by Seller of its obligations under this Agreement; (iv) Buyer's status as a "good faith" Buyer within the meaning of Section 363(m) of the Bankruptcy Code; and (v) Buyer's entitlement to all of the protections of Section 363(m) of the Bankruptcy Code.

(b)     The Sale Approval Order, to the extent permitted under the Bankruptcy Code or other applicable law, shall be binding upon and shall govern the acts of all entities, including, but not limited to, any subsequently appointed chapter 11 or chapter 7 trustee of Seller, all taxing authorities, filing agents, filing officers, title agents, title companies, recorders and/or registrars of mortgages, recorders and/or registrars of deeds, administrative agencies, governmental agencies or departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file register or otherwise record or release any documents or instruments, or who may be required to report or insure as to title or state of title in or to any of the Assets.

(c)     Seller shall provide Buyer, at least two (2) calendar days in advance of filing with the Bankruptcy Court, with a draft copy of any motions, orders, amendments, supplements or other pleadings that Seller proposes to file with the Bankruptcy Court relating to the Assets, this Agreement, or any of the other agreements and documents related to the Assets or the transfers or assignments to be made pursuant to this Agreement. Seller shall promptly take such actions as are reasonably requested by Buyer, including assisting with the filing of affidavits or other documents or information with the Bankruptcy Court for purposes, among others, of (i) demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code, and (ii) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

(d)     Seller shall comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and federal bankruptcy law, in connection with obtaining approval of the transactions contemplated by this Agreement, including serving on all required persons and entities in the Bankruptcy Case (including all holders of Encumbrances), a notice of Seller's motion seeking entry of the Sale Approval Order and the hearing thereon, and all applicable objection deadlines in accordance with the Federal Rules of Bankruptcy Procedure (as modified by orders of the Bankruptcy Court), and other orders of the Bankruptcy Court and any applicable local rules of the Bankruptcy Court.

(e)     Seller shall cooperate with Buyer and its representatives in connection with the Sale Approval Order, which cooperation shall include reasonable consultation with Buyer concerning the status of such proceedings and providing Buyer with copies of requested pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court and subject to the terms of Section 7.1(c) above.

(f)     Seller shall diligently pursue the entry of such Sale Approval Order as a Final Order (defined below) (including by presenting evidence necessary to support the Sale Approval Order, responding to objections and discovery requests made by any party in interest and taking such other actions as may be reasonably necessary to obtain entry of the Sale Approval Order). Seller shall diligently oppose and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, reargument, reconsideration or revocation) of the Sale Approval Order that is

filed. The term **"Final Order"** means an order entered by the Bankruptcy Court or other court of competent jurisdiction as to which: (i) no appeal, notice of appeal, motion for reconsideration, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed; (ii) the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) if an appeal has been timely filed no stay pending an appeal is in effect and the time for requesting a stay pending appeal shall have expired; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a Final Order unless such motion shall be filed within ten (10) days of the entry of the order at issue.

(g)     Seller shall not submit or support any plan of reorganization or liquidation to the Bankruptcy Court for confirmation or otherwise seek or support entry of any order in the Bankruptcy Case that shall conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Sale Approval Order.

**7.3     Termination Rights.**

(a)     In addition to any rights of termination granted to Seller or Buyer in this Agreement, this Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing as follows:

(i)     by the mutual written consent of Seller and Buyer;

(ii)     by either Seller or Buyer, if the Bankruptcy Court shall not have entered the Sale Approval Order within sixty (60) days of the Effective Date (unless the entry of a Sale Approval Order is delayed by reason of the Seller's failure to diligently pursue same, in which event Seller shall not have a unilateral termination right);

(iii)     by either Seller or Buyer, if any court of competent jurisdiction in the United States or other United States governmental authority shall have issued a final order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or the sale of a material portion of the Property;

(iv)     by either Seller or Buyer, if the Bankruptcy Court shall have entered an order approving an Alternative Transaction (as defined below), subject to the extent applicable, to the limitations set forth in the Sale Procedures Order. An "**Alternative Transaction**" means a transaction or chapter 11 plan in which (a) Seller sells, transfers or otherwise dispose of, directly or indirectly, all or substantially all, or any material portion, of the Assets to a person other than Buyer (or one of its affiliates), whether through an asset sale, stock sale, merger or any other transaction or (b) the consummation of such transaction or chapter 11 plan that would be inconsistent with the Transactions contemplated in this Agreement;

(v)     by Buyer if a motion to dismiss the Bankruptcy Cases or a motion to convert the Bankruptcy Cases to a case under chapter 7 of the

Bankruptcy Code or the appointment of a trustee, receiver, liquidator or other similar person for the purpose of liquidating any of the Property other than pursuant to this Agreement is granted in the Bankruptcy Case prior to entry of the Sale Approval Order;

(vi)     by Buyer if any notice of appeal of the Sale Approval Order is filed by any person or entity, and any such appeal is not withdrawn or dismissed, or an order of the appellate court affirming the Sale Approval Order in all respects is not entered (with no further appeal of the Sale Approval Order having been timely filed with any other appellate court), within 60 days following the date of entry of the Sale Approval Order by the Bankruptcy Court.

(b)     If this Agreement is terminated pursuant to Section 7.3(a) or pursuant to any other express right of termination set forth in this Agreement, this Agreement shall become null and void and have no effect, and all obligations of the parties hereunder shall terminate, except for those obligations of the parties set forth in this Section which shall remain in full force and effect.

## ARTICLE VIII
## CONDITIONS TO CLOSING

The obligations of the parties to close the Transaction are subject to the following conditions, unless waived at Closing by the party benefitted by such conditions, as well as to any other conditions expressed in this Agreement.

**8.1  Mutual Conditions.** The obligations of each of the parties hereto are subject to the following conditions:

**(a)  No Interference.** No lawsuit, governmental investigation, or other material legal action shall occur that will materially interfere with the ability of the parties to close the Transaction;

**(b)  Accuracy of Representations.** All representations, warranties, covenants, and other agreements of the parties hereto shall be true and correct in all material respects as of the Closing Date, shall be deemed to have been made again on the Closing Date, and subject to any changes contemplated by this Agreement;

**(c)  Other Agreements.** The parties shall have entered into all of the other agreements to which they have agreed to enter, including the Non-competition Agreements;

**(d)  Inventory.** The parties shall complete a mutually satisfactory physical count and examination of the Inventory as provided in this Agreement;

**(e)  Continued Compliance.** The continued compliance by the each of the parties with respect to all of their respective obligations set forth hereunder, including, but not limited to, the delivery obligations under Article IX; and

**(f)  Sale Approval Order.** The Sale Approval Order shall have been entered by the Court, which order shall not be subject, as of the Closing, to any stay or modification pending or upon appeal.

**8.2 Buyer's Conditions.** In addition to the conditions set forth in <u>Section 8.1</u> above, the obligations of Buyer to complete the Transaction are subject to the satisfaction, at or prior to the Closing, of all the terms and conditions of this Agreement to be complied with and performed by the Seller and subject to the following further conditions (each of which may, at Buyer's sole election, be waived by Buyer):

**(a)   Due Diligence.** Seller shall provide Buyer with access to all documents, records, financial statements, agreements and other information requested by Buyer. The results of such due diligence review shall be acceptable to Buyer and its counsel in their sole discretion.

**(b)   Information Verification.** Verification by Buyer of all information previously provided by the Company and the Seller and confirmation that such information is true and correct as of the Closing Date.

**(c)   No Material Change.** The absence of any Material Adverse Change in the Business, operations, or financial condition of the Company, the Assets, or any damage to, or material reduction in the value of, the Company.

**(d)   Third-Party Approvals.** The successful obtaining of the Bankruptcy Court Approval on terms acceptable to Buyer.

**(e)   Maintenance of Agreements.** The continued maintenance by the Company of its agreements material to the Business;

**(f)   Litigation.** The absence of any pending or threatened material uninsured litigation or other proceeding against the Company, the Dealership Premises, or the Operating Assets (excluding any matters disclosed to Buyer prior to signing this Agreement) which would materially adversely affect Seller's ability to perform under this Agreement;

**(g)   Inventory.** The parties shall complete a mutually satisfactory physical count and examination of the Inventory within a week before the Closing Date as provided in this Agreement.

**(h)   Schedules.** The approval by Buyer of all Schedules and other documents ancillary to the Agreement, including all Schedules to be attached to this Agreement including any updates or modifications thereof and all Closing Schedules.

**(i)   Contract Surrender Letter.** Upon the request of Buyer, the execution by the Company of a Contract Surrender Letter to terminate its Motorcycle Dealer Contract and related contracts with Buyer to be effective as of the Closing Date; and

**(j)   No Extraordinary Loss.** Except as deemed acceptable by Buyer pursuant to <u>Section 6.1(c)</u>, Seller shall not have suffered any extraordinary loss due to its property being adversely affected by any fire, explosion, accident, lock out, strike, flood, drought, windstorm, earthquake, act of God, act of Government or act of public enemy.

**ARTICLE IX**
**CLOSING**

The Closing of the Transaction (the **"Closing"**) shall take place at such time and location as the parties shall mutually select, but not later than May 31, 2020, provided that each of the conditions

set forth in Sections 8.1, 8.2 and 2.2 have been satisfied or waived (the **"Closing Date"**). The Closing shall be effective at the close of business local time on the Closing Date. The transactions at Closing, when effective, will be deemed to be effective as of the close of business on the Closing Date except as otherwise specifically provided at the time of Closing. All actions to be, taken at Closing will be considered to be taken simultaneously, and no document, agreement, or instrument will be considered to be delivered until all items that are to be delivered at the Closing have been executed and delivered. At the Closing, the following actions will occur:

**9.1     Certificates.** Each of the parties will respectively execute a certificate stating that all representations, warranties, and covenants undertaken by them pursuant to this Agreement continue to be true and correct as of the Closing Date, except to the extent of further disclosures to Buyer after the date of this Agreement (and such disclosures shall not qualify, modify, waive or terminate any such representations, warranties or covenants provided or agreed to as of the date hereof).

**9.2     Non-competition Agreement.** Seller, Shareholder and Eric Pomeroy will each execute a Non-competition Agreement as provided in this Agreement.

**9.3     Assumed Names.**  Seller shall execute and deliver to Buyer such documentation as is required by Buyer in order to give Buyer the exclusive right to any assumed names of Seller.

**9.4     Resolutions.**   Seller shall deliver to Buyer a certified copy of Seller's resolutions authorizing the consummation of the transactions set forth in this Agreement.

**9.5     Assignment.** Seller shall deliver to Buyer an assignment assigning any and all claims, guarantees, warranties, indemnities and other rights Seller may have against any suppliers or contractors in connection with the Assets.

**9.6     Notice to State.** Seller shall deliver to the State of Wisconsin, with a copy to Buyer, a completed and executed Vehicle Dealer Closeout Statement terminating Seller's Vehicle Dealer's Licenses with respect to the Dealership Premises, as may be required by applicable law.

**9.7     Documents.** Buyer and Seller shall deliver to each other at or after the Closing any and all other agreements, certificates, instruments and other documents required of Seller or Buyer hereunder. Buyer and Seller shall use their best efforts and cooperate in good faith to properly allocate between the parties all items of expense and revenue that would be the responsibility of, or belong to, each respective party based on the closing date, including but not limited to any activity posted on Seller's parts statement that occurs after the closing date, which activity would be attributable to Buyer.

**9.8     Transfer of Operating Assets,** The Company will assign all of the Operating Assets to Buyer, or Buyer's nominee as designated by Buyer to Seller in writing, by execution of appropriate bills of sale, assignments and other customary transfer documents. Seller shall execute and deliver to Buyer a Warranty Bill of Sale, substantially in the form of **Exhibit B** attached hereto, for the Assets and Buyer shall immediately be entitled to take possession of the Assets.

**9.9     Closing Schedules**. The parties will approve the following "Closing Schedules" no less than two (2) business days prior to the Closing Date:

**(a)     Inventory.** A list of all Inventory as of Closing (the **"Inventory Schedule"**), including a listing of the total value of such inventory.

**(b)** **Closing Payment Schedule**. A statement (the "**Closing Payment Schedule**") showing the calculation of the Closing Payment, as calculated in accordance with Section 2.3.

**9.10** **Closing Payment**. Buyer shall pay the Closing Payment in accordance with Article II and the Closing Payment Schedule.

**9.11** **Transfer of Intangibles and Retention of Records.** Copies of all books and records and other intangibles belonging to the Company and not included in the Assets shall be given to or left with the Company, including, without limitation, minute books, bank accounts and other intangibles, but the Buyer will have the right to all of the operational records of the Company and the right to make copies of all other tax and financial records relevant to the operation of the Business prior to Closing. At Closing, if requested, the Company shall change the Company's name at the Closing to permit Buyer to register rights to such name.

**9.12** **The Company Employees.** To the extent that Seller has any remaining employees as of the Effective Date, Seller will terminate the employment of its employees.

**9.13** **Additional Actions.** The parties will execute such documents and take such actions that may be reasonable and necessary to complete the Transaction consistent with the provisions of this Agreement.

**ARTICLE X**
**TERMINATION**

**10.1 Termination.** This Agreement will terminate upon: (a) the failure to Close prior to May 31, 2020, as the same may be extended in accordance with Article IX of this Agreement, unless the parties mutually agree to extend the Closing Date; (b) the failure of the conditions to be satisfied at or prior to the Closing Date, if not waived; (c) upon termination of this Agreement by mutual agreement of the parties hereto; (d) upon Buyer's election due to its dissatisfaction with the conditions of its performance under Section 8.2. Buyer agrees to promptly notify Seller in writing in the event of such dissatisfaction. The termination of this Agreement shall not prejudice the rights of any party to assert a claim by virtue of any default under this Agreement by another party.

**10.2 Effect of Termination.** Each party's right of termination under Section 10.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 10.1, all further obligations of the parties under this Agreement will terminate; *provided, however,* that if this Agreement is terminated by a party because of the breach of the Agreement by the other party, the terminating party's right to pursue all legal remedies will survive such termination unimpaired. If Buyer should be in default of its obligations under this Agreement, and fails to cure same within ten (10) days of Buyer's receipt of written notice of default (**"Default Notice"**), Seller shall have as Seller's sole and exclusive remedy the right to terminate this Agreement. Any Default Notice shall: (i) specifically reference that it is a "default notice" or "notice of default", (ii) describe in reasonable detail the nature of the default, (iii) describe in reasonable detail the corrective action required in order to cure such default, and (iv) set forth the date on which the cure is required to be complete, which shall not be sooner than the cure period set forth in this Agreement. Buyer's right to a Default Notice shall be absolute, unconditional and without exception, regardless of the nature of the alleged default or any other attendant facts or circumstances. Without limiting the generality of the foregoing, Buyer shall be entitled to a Default Notice in the event that Closing does not timely occur.

**ARTICLE XI**
**MUTUAL INDEMNIFICATION**

11.1    **Seller Indemnity.** The Seller agrees that it shall indemnify and hold harmless Buyer, its and their representatives, officers, directors, shareholders, employees, agents, affiliates, predecessors, successors, and assigns **("Buyer Indemnitees")** from and against any and all costs, losses, liabilities, fines, penalties, damages, litigation, claims, costs, and expenses, including· reasonable attorneys' fees and other expenses of investigation and defense (collectively, the **"Damages")** to which Buyer Indemnitees may become subject or that are incurred in connection with, arise out of, result from, or are attributable to (a) any litigation relating to the Seller or to its use of the Assets, (b) any breach of any representation or warranty made by the Seller, (c) the failure by the Seller to perform any of the covenants or obligations contained herein, specifically including, without limitation, the termination or discharge of any liability of Seller at the Closing, (d) any Excluded Asset, or any Retained Liability, or (e) any claims that could have otherwise been asserted against Seller or its affiliates based upon, resulting from or arising out of the Business, operations, properties, assets or obligations of Seller or any of its affiliates (other than the Assets or Assumed Liabilities) conducted, existing or arising on or prior to the Closing Date.

11.2    **Buyer's Indemnity.** Buyer agrees that it shall indemnify and hold harmless the Seller from and against any and all Damages to which the Seller may become subject or that are incurred in connection with, arise out of, result from, or are attributable to any material breach of the terms of this Agreement or any certificate or other document delivered hereunder or pursuant hereto by Buyer, including any material breach of any representation or warranty made by Buyer or the failure by Buyer to perform materially any of the covenants or obligations contained herein or in any certificate or other document delivered hereunder or pursuant hereto, including (without limitation) any failure of Buyer to pay when due any Assumed Liability, provided that the aggregate liability of Buyer under this Agreement (including, without limitation, Section 11.2) shall in no event exceed an amount equal to $100,000.

11.3    **Determination of Damages.** The amount of any and all Damages under this Article XI shall be determined net of the net amount of insurance proceeds recovered by the Indemnified Party under any insurance policies with respect to such Damages; provided, that no party shall have the obligation to recover from insurance policies to the extent such recovery may increase premiums under such insurance policies. In no event shall any party to this Agreement be entitled to recover or make a claim for any amounts in respect of lost profits or punitive damages and, in particular, no "multiple of profits" or "multiple of cash flow" or similar valuation methodology shall be used in calculating the amount of any Damages. Any indemnity payment under this Agreement shall be treated as an adjustment to the Purchase Price for tax purposes.

11.4    **General.** The party entitled to indemnification shall be referred to as the **"Indemnified Party,"** and the party obligated to provide such indemnification shall be referred to as the **"Indemnifying Party."** The Indemnified Party shall advise the Indemnifying Party in writing of any claim for indemnification (whether or not such claim involves a person or entity that is not a party to this Agreement (a **"Third Party"**)), although the failure to provide such written notice shall not discharge the obligations of the Indemnifying Party hereunder except to the extent the Indemnifying Party is actually damaged by such failure or delay. A decision or act by Buyer shall be deemed an act by the Buyer Indemnitees.

**11.5    Third Party Claims.**

(a)     **Procedure.** The Indemnified Party shall immediately notify the Indemnifying Party in writing of any claim by a Third Party of which the Indemnified Party becomes aware for which the Indemnifying Party has indemnification obligations hereunder, and the Indemnifying Party shall acknowledge its indemnification obligation for such claim in writing. After the Indemnified Party has received such notice from the Indemnifying Party, the Indemnified Party shall allow the Indemnifying Party an opportunity to undertake the prompt and diligent defense, settlement, or other resolution of the claim. In the event the Indemnifying Party assumes the defense as provided above, the Indemnified Party shall have the right to participate in the defense at its own expense, shall cooperate with the Indemnifying Party in such defense, and will attempt to make available to the Indemnified Party on a reasonable basis all such witnesses, records, materials, and information in its possession or under its control relating thereto as is reasonably requested by the Indemnifying Party. Without the written consent of the Indemnified Party, the Indemnifying Party shall not, in the defense of such Third-Party claim or any litigation resulting therefrom, consent to the entry of any judgment or enter into any settlement. The Indemnified Party shall not unreasonably withhold its consent for any settlement or other resolution of such claim. Any settlement of a Third-Party claim shall include, as to the Indemnified Party as an unconditional term thereof, a release by the Third Party of the Indemnified Party from any and all liability in respect of such claim or litigation unless the Indemnified Party agrees otherwise in writing.

(b)     **Defense.** In the event that the Indemnifying Party elects not to assume the defense, is unwilling to acknowledge its indemnification obligations to the Indemnified Party in writing as required by Section 11.5(a), or does not perform, or reasonably appears to be incapable of performing, such obligations, then the Indemnified Party may defend, settle, or otherwise resolve the claim as the Indemnified Party determines to be appropriate. In such case, the Indemnifying Party shall be responsible for all costs incurred, including settlement or other amounts paid to third parties, by the Indemnified Party in connection therewith and shall cooperate with the Indemnified Party in such defense and attempt to make available to it all such witnesses, records, materials, and information in its possession or under its control relating thereto as is requested by the Indemnified Party.

11.6    **Remedies.** The Indemnifying Party shall promptly reimburse the Indemnified Party for the amount of any judgment rendered against the Indemnified Party with respect to any Third Party claim in litigation or, upon request by the Indemnified Party, for any other Damages arising out of any claim not involving a Third Party. To the extent that the Indemnifying Party refuses to pay in full the Damages owed to the Indemnified Party, the Indemnified Party may utilize any legal or equitable remedy to collect from the Indemnifying Party the amount of such Damages. Nothing contained herein is intended to limit or constrain the Indemnified Party's rights against the Indemnifying Party for indemnity, the remedies herein being cumulative and in addition to all other rights and remedies of the Indemnified Party at law or inequity; provided that the aggregate liability of Buyer under this Agreement (including, without limitation, Article XI) shall in no event exceed an amount equal to $100,000.

## ARTICLE XII
## GENERAL PROVISIONS

The following general provisions shall apply to this Agreement.

12.1    **Notices.** All notices required or permitted hereunder or under any related agreement or instrument (unless such related agreement or instrument otherwise provides) will be deemed delivered when delivered personally, or when received (or delivery is refused) if mailed by certified mail, return

receipt requested, or registered mail, or sent by a nationally recognized overnight delivery service to the respective party at the following addresses or to such other addresses as each respective party may in writing hereafter designate:

> **To Buyer:**
> Harley-Davidson Motor Company
> 3700 West Juneau Avenue
> Milwaukee, WI 53208
> Attn: Bill Kulow, Dealer Development Manager
>
> With a copy sent at the same time in the same manner to:
>
> Harley-Davidson Motor Company
> 3700 West Juneau Avenue
> Milwaukee, WI 53208
> Attn: Chief Legal Officer
>
> And
>
> Foley & Lardner LLP
> 150 E Gilman Street
> Madison, WI 53703
> Attn: Roberta Howell
>
> **To Seller:**
> JHD Holdings Inc.
> c/o Davidoff Hutcher & Citron LLP
> 605 Third Avenue
> New York, New York 10158
> Attn: Robert L. Rattet, Esq.

**12.2    Successors and Assigns.** This Agreement will be binding upon the parties hereto and their respective successors, personal representatives, heirs, and assigns. However, no party hereto will have any right to assign any of its obligations pursuant to this Agreement except with the prior written consent of all of the other parties, except that Buyer may assign its rights hereunder to its owners, or their affiliates, or entities under its or their control.

**12.3    Merger.** This Agreement and the exhibits and other documents, agreements, and instruments related hereto set forth the entire agreement of the parties with respect to the subject matter hereof supersede all other written and oral discussions and communications regarding the subject matter hereof, and may not be amended or modified except in writing subscribed to by all such parties.

**12.4    Governing Law and Jurisdiction.** This Agreement is entered into in Wisconsin. THIS AGREEMENT SHALL, IN ALL RESPECTS, BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE FEDERAL LAWS OF THE UNITED STATES AND THE LAWS OF THE STATE OF WISCONSIN.

**12.5    Counterparts; Effective Date; Facsimile Copies.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall

be deemed to be a single instrument, and shall be effective as of the date set forth above when one or more counterparts have been signed by each of the parties and delivered to the other parties. A facsimile copy of this Agreement and any signatures on any counterpart hereof shall be considered for all purposes as originals.

**12.6    Interpretation.** This Agreement has been prepared and negotiated by all parties and all parties have been represented by counsel. Accordingly, it will not be construed against any particular party as the party that drafted the Agreement.

**12.7    Attorneys' Fees.** Should any party hereto institute any action or proceeding in court or otherwise to enforce or interpret this Agreement by reason of or with respect to an alleged breach of any provision hereof, the prevailing party shall be entitled to receive from the non-prevailing party such amount as the court may judge to be reasonable attorneys' and paralegals' fees for the services rendered to the prevailing party in such action or proceeding, plus the prevailing party's costs and expenses therein.

**12.8    Modification or Severance.** In the event that any provision of this Agreement is found by any court or other authority of competent jurisdiction to be illegal or unenforceable, such provision shall be severed or modified to the extent necessary to render the remainder of the Agreement enforceable, and, as so severed or modified, this Agreement will remain in full force and effect.

**12.9    Assignment.** Rights under this Agreement shall not be assigned by either party without the consent of the other, except that Buyer may assign its rights under this Agreement to a newly formed entity controlled by Buyer or its shareholders without Seller's consent. Nothing in this Agreement, express or implied, is intended to confer on any person, other than the parties and their successors, any rights or remedies under or by reason of this Agreement.

**12.10    Amendment and Waiver.** This Agreement may be amended or modified at any time and in all respects and any provision may be waived by an instrument in writing executed by Buyer and Seller, or by either of them in the case of a waiver.

**12.11    Dispute Expenses.** Should any arbitration or litigation be commenced between the parties or by one of the parties to the Agreement concerning the rights and duties of either party in relation to the dealership or this Agreement, the prevailing party in the arbitration or litigation shall be entitled to (in addition to any other relief that may be granted) a reasonable sum as and for attorney fees in the arbitration or litigation, which sum shall be determined by the court or other person presiding in the arbitration or litigation or any separate action brought for that purpose.

**12.12    Headings.** Headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning of interpretation of this Agreement.

**12.13    Parties in Interest.** All of the terms and provisions of this Agreement shall be birding on and inure to the benefit of and be enforceable by Seller and Buyer and- their respective successors, assigns, heirs and personal representatives.

**12.14    Entire Agreement.** This Agreement, and the documents to which it refers, constitutes the entire agreement between the parties and there are no agreements, understandings, restrictions, warranties or representations between the parties other than those set forth or provided in this Agreement.

**12.15    Employees of Seller.** The Company shall be solely responsible, and Buyer shall have

no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, any other emoluments, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with the Company at any time prior to the Closing Date, and the Company shall pay all such amounts to all entitled persons on or prior to the Closing Date.

**12.16 Public Announcements.** All notices or statements to third parties and other publicity concerning this Agreement and the actions contemplated in this Agreement shall be made in a form and content and at such time as the parties shall mutually agree. No notices or statements shall otherwise be made by any of the parties.

**12.17 Definition of "Knowledge of Seller."** For purposes of this Agreement, the terms "to the best of Seller's knowledge," "to Seller's knowledge" or "known by Seller" and similar terms shall mean the actual knowledge of Seller or Eric Pomeroy, Sara Pomeroy or other owners or general managers of Seller of a particular fact or other matter or awareness that a prudent individual could or should be expected to obtain through their knowledge, ownership and/or management of the Business, in each case, after reasonable inquiry and investigation.

*[Signature Page Follows.]*

IN WITNES WHEREOF, this Asset Purchase Agreement is entered into as of the Effective Date.

**SELLER PARTIES:**                                    **BUYER:**

**JHD HOLDINGS INC.**                                  **HARLEY-DAVIDSON MOTOR COMPANY, INC.**


By:*/s/ Sara Pomeroy*                                  By:*/s/ David Cotteleer*
Name: Sara Pomeroy                                     Name: David Cotteleer
Title: President                                       Title: Vice President and Managing Director of U.S. Sales
                                                       Markets


By:*/s/ Sara Pomeroy*
     Sara Pomeroy, as Shareholder


By:*/s/ Eric Pomeroy*
     Eric Pomeroy, pursuant to Section 3.1

**<u>Schedules</u>**

<u>Schedule 1.1(s)</u>  –  New Motorcycle Inventory
<u>Schedule 1.1(y)</u>  –  Used Motorcycles
<u>Schedule 4.4</u>  –  Financial Statements
<u>Schedule 4.11</u>  –  Recent Transactions (since 12/31/2016)

**<u>Exhibits</u>**

Exhibit A  –  Form of Non-competition Agreement
Exhibit B  –  Form of Warranty Bill of Sale

SCHEDULE 1.1(s)
New Motorcycle Inventory

4849-7303-4423.12

SCHEDULE 1.1(y)
Used Motorcycles

SCHEDULE 4.4
FINANCIAL STATEMENTS

[Attached]

SCHEDULE 4.11
RECENT TRANSACTIONS

NONE

4849-7303-4423.12

**<u>EXHIBIT A</u>**
**Form of Non-competition Agreement**

Attached.

## EXHIBIT B
## Form of Warranty Bill of Sale

Attached.