UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:
    H2D Motorcycle Ventures, LLC,      Case No. 19-26914-beh
and

    JHD Holdings, Inc.,      Case No. 19-26915-beh
        Jointly Administered Debtors.      Chapter 11

**DECISION AND ORDER GRANTING THE U.S. TRUSTEE'S MOTION TO CONVERT, AND HOLDING IN ABEYANCE (1) DEBTORS' MOTION TO DISTRIBUTE PROCEEDS, (2) CREDITOR'S MOTION FOR RELIEF FROM STAY, AND (3) VARIOUS APPLICATIONS FOR COMPENSATION**

After two significant asset sales and release of some other collateral, debtors would like their cases dismissed, but only after paying several preferred administrative claims. The present record reflects minimal effort, if any, toward even a liquidation plan, so the fairer course is to convert these jointly administered cases now, as the United States Trustee and landlord ask, and allow Chapter 7 trustees to investigate millions of dollars' worth of pre-petition , thereby improving the potential that more than the select administrative claimants will obtain some recovery.

**JURISDICTION**

The Court has jurisdiction over the issues before it pursuant to 28 U.S.C. § 1334. Each of the instant requests for relief are core proceedings insofar as they concern the administration of the estate. 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052 (incorporating Fed. R. Civ. P. 52(a)).

## FACTUAL BACKGROUND

When they invoked Chapter 11 bankruptcy protection in July 2019, debtors, H2D Motorcycle Ventures, LLC and JHD Holdings, Inc., each owned a Harley-Davidson franchise dealership. H2D operated a dealership in New Berlin, Wisconsin; H2D is 100% owned by Sara Pomeroy, and was managed by its CEO, Eric Pomeroy—Sara's husband. JHD operated a dealership in Janesville, Wisconsin; JHD also is 100% owned by Sara Pomeroy, and its CEO is Eric Pomeroy.

The debtors represented that their insolvency was brought about by "accumulated losses incurred under prior operations management teams." ECF Doc. 2, at 2.[1] They laid blame on the poor performance of the management teams at the dealerships. Indeed, Eric Pomeroy testified that he and his wife were "investors, absentee owners" and that as of June 2020, he had not visited the dealerships for about 18 months.

On the day of filing their cases, the debtors asserted that a Chapter 11 reorganization would "effectuate a projected significant increase in revenues and profits which will permit the Debtors to accumulate revenues and materially increase the value of each franchise as part of a 2 year business plan, at the end of which the Debtors intend to market and sell the franchises, resulting in a significant, if not 100% return to *all* creditors." *Id.* at 2–3 (emphasis in original).[2]

---

[1] All references to docket filings refer to the primary case, H2D, case no. 19-26914-beh.
[2] Statements made in argument and later docket filings indicate that both dealerships were closed already. *See Debtors' Motion to Pay Proceeds*, ECF Doc. No. 346, at ¶ 6 ("The dealerships

Despite the first-day motion asserting the debtors' intent to reorganize, three weeks later, the debtors sought an order to employ Performance Brokerage Services, Inc. ("PBS" or the "Broker")—a broker service who specializes in the sale of motorcycle dealerships—as the exclusive broker to assist in procuring a purchaser for the dealerships. In this motion, the debtors represented that they:

> . . . intend[ed] to use the Chapter 11 process to *immediately conduct a nationwide marketing and sale process* to sell their franchises/dealerships in an effort to maximize a return to their respective creditors. The Debtors *have already begun working* feverishly on marketing their franchises for sale. Prior to the Chapter 11 filings, in or about late 2018, the Debtors began exploring the option of selling their dealerships. To the end, in January 15, 2019, each Debtor engaged the Broker for Broker to market and endeavor to sell the dealerships. However, no transactions resulted from such engagement. Since the Chapter 11 filings, the Debtors and the Broker have revised the terms of engagement . . .. The Broker has been continuously working with the Debtors to actively market and sell the dealerships. . . . the Debtors require the continued assistance and expertise of the Broker, . . ..

ECF Doc. No. 23, at 5, ¶¶ 10–13 (emphasis added).

The debtors also sought an order to employ their accountants, Baker Tilly ("BT" or the "Accountants"), explaining the same intent to "immediately conduct a nationwide marketing and sale process," for which BT would be necessary. ECF Doc. No. 34, at 4–5.

---

were closed prior to the Petition Date. . ."); *see also Rattet PLLC's Application for Compensation*, ECF Doc. No. 273, at 4–5 (discussing that a portion of the $75,000 pre-petition retainer was expended on various activities for anticipated first-day relief that came to naught, because "shortly before the Filing Date, the transaction [unwound] and the Debtor closed the Dealership and 'went dark.'").

**A. The Sales**

On September 16, 2019, two months after filing their bankruptcy petitions—and before the United States Trustee ("UST") had concluded his 341 meetings of creditors—the debtors sought entry of a Court order concerning the sale of H2D's dealership and related assets pursuant to 11 U.S.C. § 363(b), requesting that the Court: approve bidding procedures, identify a stalking horse bidder, set a break-up fee for the stalking horse, schedule an auction and sale hearing, and authorize the sale of substantially all of H2D's assets free and clear of liens under § 363(f) ("H2D sale"). ECF Doc. No. 55. Additionally, the debtors requested that the Court shorten the time to object to entry of this order and schedule the matter for hearing on an expedited basis. ECF Doc. Nos. 56, 57. The dealerships' landlord ("CARS")[3] and the UST filed objections to the H2D sale motion, primarily based on the inclusion of a break-up fee for the stalking horse. ECF Doc. Nos. 77, 83.

On September 24, 2019, the debtors sought entry of another Court order, substantially similar in form and relief sought but concerning the sale of JHD's dealership and related assets ("JHD sale"). ECF Doc. No. 78. The debtors also asked that this motion be considered under a shortened objection period and at an expedited hearing. ECF Doc. Nos. 79, 80. The UST objected to the JHD sale motion, again based on the inclusion of a break-up fee. ECF Doc. No. 107.

---

[3] H2D's landlord was CAR BRD WI BERLIN L.L.C.; JHD's landlord was CAR BRD WI JANE L.L.C. During these proceedings, both entities were collectively represented by counsel and referred to as "CARS"; the Court will do the same.

The Court held a preliminary hearing on the debtors' sale motions on September 25, 2019, which was adjourned to allow the debtors time to provide evidence for the relief requested. On October 16, 2019, the Court held the adjourned hearing, took testimony from the long-time broker for the debtors and the proposed stalking horse bidder for H2D, and granted the debtors' requests as it pertained to approval of bidding procedures and scheduling auctions. ECF Doc. Nos. 129, 130. The Court reduced the proposed break-up fee for the JHD sale. ECF Doc. 114, 130. The Court also set a hearing date following the auction dates to consider final approval of the sales. *Id.*

On November 7, 2019, the H2D auction was conducted, where the stalking horse was out-bid by Lone Star-Cardinal Motorcycle Ventures VIII, LLC ("Lone Star"). ECF Doc. No. 154. The JHD auction was cancelled because there was only one qualified bidder, Steve Kearns. ECF Doc. No. 155. One week later, the Court held a final evidentiary hearing on the two sales. The Court received testimony from George Chaconas, the broker, Anthony Giglio of Lone Star, and Steve Kearns, the JHD bidder. The Court heard arguments from all parties-in-interest who had appeared. *See Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537 (7th Cir. 2003) (holding that where lessee had notice and failed to object, sec. 363(f) sale of property was free and clear of lessee's possessory interest under sec. 365(h)). As prior objections had been resolved, the Court orally rendered its findings under sections 363(b) and 363(f), and conditionally approved both the pending sale of H2D's assets to

Lone Star and the pending sale of JHD's assets to Kearns, subject to minor revisions accepted by the parties and several proof of service items.

Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . " 11 U.S.C. § 363(b)(1). In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the trustee (or, debtor-in-possession) exercised sound business judgment. *See Westmoreland County Emp. Retirement Sys. v. Parkinson*, 727 F.3d 719, 725 (7th Cir. 2013) (explaining, at least under Delaware law, that the business judgment rule establishes "a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in honest belief that action taken was in best interests of the company"); *In re Hansen*, 2016 WL 6208357, at *16 (Bankr. E.D. Wis. Oct. 24, 2016) (describing similar rule and presumption adopted in Wisconsin). Courts generally do not "interfere with business decisions absent a showing of bad faith, self-interest, or gross negligence." *In re Integrated Res., Inc.* 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *see also In re Ashley River Consulting, LLC*, 2015 WL 4186130 (Bankr. S.D.N.Y. July 10, 2015) (approving sale procedures, despite creditor's objection that procedures amounted to *sub rosa* plan of reorganization and declaring that it is "not resolving any party's entitlement to distributions of sale proceeds at [that] time.").

According to the testimony, the proposed sale of H2D's assets was the result of several years' effort by H2D ownership and the PBS broker to convey

the dealership. Whatever circumstances thwarted earlier sales efforts, the generation of only two bids—with neither of them totaling half of H2D's secured debt, and value, including goodwill, continuing to erode—reasonably signaled that approving a "bird in the hand" was the better course.

Similarly considering the proposed sale of JHD assets, where the dealership had been on the market the same length of time and subject to the same degree of effort, it seemed the better course for the Court to grant the debtor's request to approve Kearns' purchase than require the prospective buyer and all interested parties to wait until a plan would be proposed. Counsel for debtors agreed that post-closing, the sales proceeds would be forward to the DIP accounts, they would further consult about a plan(s), and so the Court set the next status conference.

The Court held that next conference on January 29, 2020. Counsel reported that neither sale had closed by the projected dates (of December 31, 2019 and January 15, 2020). The parties believed that H2D and Lone Star were close to agreement and closing. The JHD sale was in limbo pending certain due diligence inquiries regarding Steve Kearns.

1. **Final H2D Sale**

On February 20, 2020, H2D and Lone Star closed their sale process, which, after adjustments and credits, resulted in net cash proceeds to the H2D

estate of $888,107.50, with an additional escrow reserve of $50,000. (Collectively, "H2D sale proceeds").[4] ECF Doc. No. 242.

### 2. Final JHD Sale

The JHD sale, on the other hand, failed due to conditions precedent in the Asset Purchase Agreement—namely, Kearns was not approved to be an authorized dealer of Harley-Davidson Motor Corporation ("HDMC"). ECF Doc. No. 246. HDMC rejected Kearns' application to become an authorized dealer around February 14, 2020. *Id.* Thereafter, the debtors canceled that sale and began seeking an alternative purchaser. *Id.* Despite the failed sale of the dealership, Kearns moved forward to purchase the Janesville premises from CARS. ECF Doc. No. 250.

Meanwhile, and in light of Kearns retaining the rights to the premises but not to the assets located at the premises, secured creditors Harley-Davidson Credit Corporation ("HDCC") and Byline Bank together moved for Court approval to remove their collateral—motorcycles, parts, accessories, and equipment—from the dealership's location in Janesville and store them elsewhere for safekeeping. The Court approved this request. ECF Doc. No. 251. Further, Byline Bank received relief from the automatic stay to take possession of its collateral that was not subject to any other liens—namely, certain non-Harley-Davidson-branded furniture, fixtures, and equipment. ECF Doc. No. 299.

---

[4] The H2D sale proceeds are fully encumbered by the secured liens of HDCC and Byline Bank.

When HDMC exercised its right to deny approval to Kearns to become a licensed dealer, additional negotiations ensued with HDMC over a contemplated buyback option. Eventually, the debtors filed a motion to sell the JHD assets to HDMC, requesting that the assets be sold free and clear of liens under § 363(f). ECF Doc. No. 321. JHD and HDMC had devised an Asset Purchase Agreement whereby the manufacturer would purchase the dealership assets at a price equaling approximately 20% of JHD's secured debt.

No party filed an objection. On May 7, 2020, the Court held an evidentiary hearing. After considering the nature of the sale—particularly that HDMC was both the entity who rejected the first proposed buyer and was now itself the proposed buyer—taking into account the COVID-19 pandemic and its repercussions for all retail entities in Spring 2020, and weighing compelling testimony from Mr. Bill Kulow of HDMC as to the manufacturer's involvement in the debtors' efforts to sell the dealership over the past two years, market factors in southeastern Wisconsin and other factors affecting pricing, along with evidence already of record regarding the broker's sustained but unsuccessful efforts, the Court found notice of the sale was sufficient, the proposed sale agreement was in good faith, and satisfied the business judgment rule. The Court approved the proposed sale. ECF Doc. No. 358, 361.

On June 2, 2020, JHD and HDMC closed their sale process, which, after adjustments and credits, resulted in net cash proceeds to the JHD estate of $971,357.00. (Collectively, "JHD sale proceeds").[5] ECF Doc. No. 404.

---

[5] The JHD sale proceeds are fully encumbered by the secured liens of HDCC.

### B. Interrelated Non-Sale Motions

While the above sales were concluding, other activity was taking place, including Rule 2004[6] efforts by the landlord to acquire information as to possible fraudulent or preferential conveyances, and the debtors' attempt to accelerate their exit from bankruptcy.

At a March 4, 2020 status conference, debtors' counsel informed the Court and interested parties that the debtors had been unable to formulate a confirmable plan. They asserted that HDCC and Byline wanted to recover on their collateral "and then we could talk about conversion." Debtors' counsel represented they were focused on selling the dealerships so as to "conclude the cases." Counsel for the UST expressed concern about deficient monthly operating reports, a lack of bank statements, and lack of progress toward filing any Chapter 11 plan. When debtors' counsel asked for a hearing date for "omnibus motions" to address distribution of sale proceeds, the Court slowed down the process and set several status hearings.

On March 10, the debtors' counsel filed two applications for administrative expenses relating to their representation, an application for administrative expenses on behalf of the Broker, and an application for administrative expenses on behalf of the Accountants. ECF Doc. Nos. 273, 274, 275, and 276. On March 13, the landlord, CARS, filed its applications for

---

[6] *See* ECF Doc. Nos. 213, 214, 215, 239.

administrative expenses relating to unpaid post-petition rent and lease rejection damages. ECF Doc. No. 280, 281.[7]

At a March 31, 2020 status conference, debtors' counsel confirmed that the debtors would not be able to propose confirmable plans, even after accounting for the proceeds from the two sales (by this time, the H2D sale had closed but the JHD sale was still in flux). Debtors' counsel asserted that all of the sale proceeds would be encumbered by the liens of secured creditors. Consequently, the Court issued an order to show cause requiring the parties to brief whether the cases should be converted or dismissed under 11 U.S.C. § 1112(b). ECF Doc. No. 311.

On April 30, the debtors filed a motion to pay select administrative claimants from proceeds of both sales. ECF Doc. No. 346. The debtors proposed to use a portion of the sale proceeds to pay debtors' counsel, the Broker, the Accountants, and the UST, asserting that their services were "in connection with and benefit[ed]" the sales ("motion to distribute"). *Id.* They also filed up-to-date compensation applications for debtors' counsel, the Broker, and the Accountants. ECF Doc. Nos. 338, 339, 340, 341.[8] On the same date, the debtors filed a statement in response to the Court's order to show cause, conceding they are administratively insolvent, have *de minimis* assets

---

[7] There also is a pending application for administrative expenses filed by First Extended Service Corporation, relating to unpaid post-petition services. ECF Doc. No. 253.

[8] Both the March 10, 2020 counsel fee applications and April 30, 2020 applications state that "Applicant, through its services has endeavored and succeeded in assisting the Debtors in restructuring their varied debt obligations *while insuring a meaningful distribution to unsecured creditors.*" ECF Doc. Nos. 273, at ¶ 48; 274, at ¶ 58; 338, at ¶ 51; and 341, at ¶ 58 (emphasis added). It is unclear if this is a vestige from a template fee motion.

remaining, and consenting to dismissal of their cases. ECF Doc. No. 349. Key to the debtors' agreement to dismiss, however, was a request that the Court approve the debtors' proposed motion to distribute *before* dismissal. *Id.* CARS objected to the debtors' motion to distribute. ECF Doc. No. 370. Byline Bank filed a limited objection to the motion to distribute. ECF Doc. No. 368. The Broker filed a limited objection to the motion to distribute. ECF Doc. No. 371.

On May 15, 2020, the UST filed both an objection to the debtors' motion to distribute and his own motion to force conversion of the Chapter 11 cases to separate Chapter 7 proceedings. ECF Doc. No. 364, 365. CARS objected to dismissal of the cases, asserting that conversion is more appropriate. ECF Doc. No. 370. HDCC filed a limited objection to the UST's motion to convert. ECF Doc. No. 379. Byline Bank filed a limited objection to the UST's motion to convert. Doc. No. 381.

At the same time, HDCC also filed a motion for relief from the automatic stay. ECF Doc. No. 372. HDCC requested (1) that it be permitted to repossess any collateral that remained unpurchased by HDMC in the JHD sale and (2) should the Court deny the debtors' motion to distribute, that it be permitted to repossess the sale proceeds. HDCC asserted that it is entitled to relief from the stay under § 362(d)(2) because the debtors lack equity in the sale proceeds and any unsold assets—"There is no dispute that HDCC's secured claims . . . far exceed the value of the [sale proceeds]—and because the debtors "do not have any equity in the [sale proceeds and unsold assets]." *Id.* at 8–9.

# DISCUSSION

With the two completed sales, approximately $1.9M in sale proceeds, few other disclosed assets, and the possibility of significant recovery of prepetition transfers, the Court must consider the best sequence and means of handling the present motions—(1) the UST's motion to convert, (2) the debtors' motion to distribute, (3) the secured creditor's motion for relief from stay, and (4) various requests for administrative expenses—against the debtors' admission that the Chapter 11 process is no longer an option for them, as well as other facts of record.

## A. The Parties' Arguments

The debtors assert that the Court *first* should approve their motion to distribute the sale proceeds. They argue that HDCC, their primary secured creditor, as well as Byline Bank, have consented, explicitly or implicitly, to a "carve-out" or "surcharge" against the sale proceeds, to be used to pay four administrative claimants of H2D, and the UST, and three administrative claimants of JHD, plus the UST. Debtors say the exact label for this deduction from proceeds does not matter, because the sale proceeds constitute collateral, and are therefore HDCC's property, not property of the estate. The debtors argue that HDCC should be entitled to do with it as it wishes, and this allocation of proceeds is a constitutional right. Beyond granting the motion to distribute, the debtors do not have a position on whether to dismiss or convert.

HDCC concurs with the debtors' position that the sale proceeds are its collateral, not property of the estate. HDCC does not object to dismissal or

conversion, so long as it receives the sale proceeds first—either through the Court approving the motion to distribute or the Court granting HDCC relief from the stay—and HDCC prefers not to participate in Chapter 7 proceedings.

The second-largest secured creditor, Byline Bank, concurs that the sale proceeds are not property of the estate, but asserts that the sale proceeds remain subject to its liens.

Conversely, the UST asserts that because the debtors cannot present confirmable Chapter 11 plans, the cases must be dismissed or converted. The UST further argues that the sale proceeds currently remain property of the estate and therefore the Court *first* should convert the cases to two separate Chapter 7 proceedings, and *then* consider the debtors' motion to distribute with input from the independent Chapter 7 trustees. The UST argues that the debtors' plan of action is a "structured dismissal" and their proposal to pay select administrative claimants is the type of "'end-of-case distribution[s] that would be flatly impermissible in a Chapter 7 liquidation or a Chapter 11 plan' and the kind of arrangement" that the United States Supreme Court warns against in *Czyzewski v. Jevic Holding Corp.*, -- U.S. --, 137 S. Ct. 973, 197 L.E.2d 398 (2017). ECF Doc. No. 365, at ¶37.

CARS concurs with the UST and further argues that it has independently investigated and outlined approximately $4.5 M in asserted fraudulent transfers or insider preference payments that could be recovered in Chapter 5 avoidance actions.

## B. Analysis of the UST's Motion to Convert

After reviewing the history of these cases and the applicable law, the Court concludes that, even though it will mean additional delay for some parties, converting these cases now to Chapter 7 proceedings is in the best interests of all creditors and the estates.

Section 1112(b) of the Bankruptcy Code provides that on the request of a party in interest, and after notice and a hearing, the court shall convert the case to Chapter 7 or dismiss the case, whichever is in the best interests of creditors of the estate, so long as the movant establishes "cause." *See* 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) contains a non-exhaustive list of grounds that constitute cause, which includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."

Here, the debtors assert that after the sale of dealership assets, there are no funds to pay administrative claims, secured lenders, or unsecured creditors. The bankruptcy estates continue to incur expenses and there are no on-going operations or readily available assets to pay those debts. As such, there is continued diminution of the estates. *See In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 742–43 (Bankr. N.D. Ill. 2004).

Accepting this description, and because all of the parties, including the debtors, agree that cause exists under sec. 1112(b)(1) to convert or dismiss, the sole issue at this point is to determine which of those two options is in the best interests of the creditors and the estates.

The phrase "best interests of creditors and the estate" is not defined in the Bankruptcy Code. *See* 11 U.S.C. § 1112(b); Richard Levin & Henry J. Sommer, 7 COLLIER ON BANKRUPTCY ¶ 1112.04[7] (16th ed.). Bankruptcy courts have broad discretion in deciding whether to convert or dismiss a case. *In re Capra*, 614 B.R. 291, 297 (Bankr. N.D. Ill. 2020). In many cases, courts find that creditors are "typically 'best served by the course of action that results in the largest number of [them] being paid the largest amount of money in the shortest amount of time.'" *Id.* (quoting *In re Aurora Memory Care, LLC*, 589 B.R. 631, 643 (Bankr, N.D. Ill. 2018)). That calculus is undeniably a sliding scale. Courts also "compare how creditors fare inside, as opposed to outside, bankruptcy." *In re Green Box NA Green Bay, LLC*, 579 B.R. 504, 511 (Bankr. E.D. Wis. 2017).

In deciding between conversion and dismissal, courts have considered the following factors:

> (1) Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal,
> (2) Whether there would be a loss of rights granted in the case if it were dismissed rather than converted,
> (3) Whether the debtors simply would file a further case upon dismissal,
> (4) The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors,
> (5) In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise,
> (6) Whether any remaining issues would be better resolved outside the bankruptcy forum,
> (7) Whether the estate consists of a "single assets,"
> (8) Whether the debtor had engaged in misconduct and whether the creditors are in need of a chapter 7 case to protect their interests,

> (9) Whether a plan has been confirmed and whether any property remains in the estate to be administered, and
>
> (10) Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*Id.* (citing *In re Helmers*, 361 B.R. 190, 197 (Bankr. D. Kan. 2007) (in turn, citing Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 1112.04[6] (15th ed.))).

Many of these factors appear inapplicable or neutral here. For example, there is no indication these debtors plan to file a future case following a dismissal, there is no on-going enterprise, this is not a single-asset real estate case, no plan has been confirmed, and there are no apparent environmental or safety concerns at play.

On the other hand, the parties have presented some argument on factors (1), (2), (4) and (8). CARS has outlined over $4 M in possible fraudulent or preferential transfers by the Pomeroys and their other entities, as suggested by the fruits of its Rule 2004 examinations. The UST submits that this is valid reason to convert and has offered the assistance of his office in conducting such investigations. While these allegations are not determinative of the matter, should the Chapter 7 trustees' investigations yield even one-quarter of the alleged $4 M in transferred funds for the benefit of debtors' creditors, it would mean not a barren lake, but relatively bountiful seas. *See In re T.S.P. Indus., Inc.*, 120 B.R. 107, 111 (Bankr. N.D. Ill. 1990) (cautioning that a motion to convert should not be used as a "pretext for a fishing expedition, especially when the lake looks so barren.").

True, conversion may not ensure full repayment of each of the debtors' creditors, but even some recovery of transfers could contribute to a fair and equal treatment for creditors in receiving *pro rata* shares of that recovery. *See In re Capra*, 614 B.R. at 298. Juxtaposing that possibility against debtors' presently proposed scenario, where only select administrative claimants receive payment after HDCC and Byline work out their lien rights, conversion holds more promise that other administrative claimants will received at least a *pro rata* portion. In short, as in the *Capra* case, there seems to be little risk that trustee fees would "eat up most of the funds available for distribution to unsecured creditors." Conversion and appointment of case trustees, with assistance of the UST, likely would increase the assets available, ensuring fair and equitable distribution. *See id.*

Further, the *Capra* court not only considered the best interests of creditors but also the best interests of the estate. There, the court was disinclined to dismiss and thereby permit "a debtor who has systematically abused the bankruptcy process to walk away from all consequences of that misconduct." *Id.* at 299. In *Capra*, the debtor had filed false schedules and sold property without court authorization. The Court does not now make any findings that the debtors here have abused the bankruptcy process but awaits the fruits of the Chapter 7 trustee investigations on prepetition transfers.

Once a movant establishes that cause for conversion exists, the burden shifts to the opposing party to specifically identify unusual circumstances that show conversion would not be in the best interest of the estate and its creditors

or that there is a reasonable likelihood that a plan will be confirmed. *In re Grasso*, 497 B.R. 448, 455 (Bankr. E.D. Pa. 2013); *see also In re Aurora*, 589 B.R. at 638. Here, just the opposite has occurred—the debtors openly announced that there will be no Chapter 11 plans. Indeed, the present record reflects minimal effort toward devising any.[9] The debtors urge that because the entities are insolvent and by their assessment any recovery would be *de minimis*, the Court should approve payment to the select administrative claimants and dismiss the case. The debtors have failed to discuss any possible benefits of conversion or likelihood of recovery following the Chapter 7 trustees' transfer investigations. The debtors have not met their burden to oppose conversion.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court finds cause exists to convert these jointly administered Chapter 11 proceedings, and that conversion to separate Chapter 7 cases is in the best interest of creditors and the estate. Accordingly,

1. The United States Trustee's motion to convert is GRANTED. Case No. 19-26914-beh (*In re H2D Motorcycle Ventures, LLC*) and Case No. 19-26915-beh (*In re JHD Holdings, Inc.*) are hereby converted to Chapter 7, effective immediately.

2. The debtors' motion to distribute the sale proceeds (titled "*Debtors' Motion for Order Authorizing Distribution of Proceeds from Sale of*

---

[9] A review of the four fee applications from debtors' counsel found a total of three time entries, for a billing total of 0.7 hours, that expressly referenced discussion of a plan or disclosure statement. ECF Docs. Nos. 273, 274, 338, 341.

*Debtors' Dealership-Related Assets*" at ECF Doc. No. 346) will be held in abeyance pending the appointment of Chapter 7 trustees, and receipt of their recommendations as to the motion(s).

3. The various outstanding motions to approve administrative expenses also will be held in abeyance pending the appointment of Chapter 7 trustees, and receipt of their recommendations. (at ECF Doc. Nos. 253 (*First Extended*); 280 and 281 (*CARS*); 338 (*Rattet PLLC*); 339 (*PBS*); 340 (*BT*); and 341 (*Davidoff Hutcher & Citron LLP*)).

4. HDCC's motion for relief (titled "*Motion for Relief from the Automatic Stay*" at ECF Doc. No. 372) also will be held in abeyance pending the appointment of Chapter 7 trustees, and receipt of their recommendations as to the motion. The automatic stay of section 362(a) will remain in effect as to HDCC pending a final hearing and determination by this Court. The thirty-day period of section 362(e)(1) is hereby extended for 90 days given the compelling and complicated circumstances of these cases.

Dated: June 18, 2020

By the Court:

Beth E. Hanan
United States Bankruptcy Judge